## Bell's Appeal.

1. Section 1 of Act of March 12th 1800 as to sale of real estate under a will when no person is named to execute the power, is not repealed by 12th section of Act of February 24th 1834.

2. The Act of 1834 merely regulated the mode in which the power was to be executed.

3. Section 8 of Act of April 22d 1856, does not repeal section 12 of Act of 1834.

4. A testator directed his land to be sold and the proceeds to be divided amongst three daughters, naming no one to execute the power. The executor having become the owner of two shares, sold the whole at private sale. *Held*, that this did not divest the interest of the third.

5. Not having obtained authority from the Orphans' Court, his vendee took no title to the third share, either in the land or its proceeds.

6. It *seems* that if he had reported the sale to the Orphans' Court and it had been confirmed after notice to all in interest, it would have validated the sale.

November 10th 1870. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Appeal from the Orphans' Court of *Allegheny county:* No. 199, to October and November Term 1869.

The proceeding in this case arose on the distribution of the sum of $4506.06, the balance in the hands of William Galbreath, surviving executor &c., of Samuel Galbreath, deceased. The matter was referred to Thomas MacConnell, Esq., as auditor. By his report it appeared that the decedent died in 1841, seised of a farm of about 107 acres, and having made his will, which was proved January 10th 1842. By it he directed, that after the death of his widow and of his son Robert and his wife, his farm should be sold and after giving some small legacies, he ordered the balance of the proceeds to be equally divided amongst his daughters, Ann Miller, Nancy Potter and Elizabeth Scroggs. There was no one named in the will to execute the power of sale. Elizabeth Scroggs and Nancy Potter conveyed their interests in the farm to William Galbreath, the surviving executor. Robert, having survived the testator's widow and his own wife, died in December 1865. Ann Miller, who had removed to the state of Indiana, died about the 7th of February 1866, having made a will dated in 1863, leaving

[Bell's Appeal.]

the following children, Samuel G. Miller, James Miller and Nancy Herriott, residing in Indiana; John Miller and Ann Miller, residing in Iowa. By her will she gave to Nancy Herriott $800 of her "proportion" of her father's estate, and further directed: "But in case that said interest shall be worth more than $800, I do hereby direct that the same may be equally divided among my children that may be living at the time of my brother Robert Galbreath's death." She appointed Nancy Herriott executor.

In December 1866, Mrs. Herriott wrote to Mrs. Potter, one of the daughters of the decedent, expressing an anxious wish that the land of her grandfather should be sold; this letter was shown to William Galbreath, the executor; letters were written also by other children of Mrs. Miller to the same effect, generally to one Cyrus K. Potter, a grandson of the decedent, who attended much to the business of the executor in reference to this real estate. The executor, in view of the urgency of these letters and of the unproductivenes of the farm, on the 15th of January 1867, without having asked or procured any authority from the Orphans' Court, contracted to sell it to Matthew Andrews for $6000, of which $2000 were paid in hand, $1000 to be paid on the 1st of April then next, $1500 on the 1st of April 1868, and $1500 on the 1st of April 1869. In the articles he did not state that he sold as executor. On the 15th of March 1867, Andrews by articles contracted to sell to Abraham Bell and James K. Bell, at an advance of $1250, and the executor accepted them as purchasers instead of Andrews. On the 30th of March, the Bells paid the executor $1000, the second instalment of the purchase-money. Mrs. Herriott, and three others of Mrs. Miller's children, were informed of the sale of the farm and these transactions in connection with it; she came to Pittsburg, and stayed at the house of the executor, was informed of all the circumstances and expressed no dissatisfaction. Being about to return home from Pittsburg Mrs. Herriott and the executor went to the office of his counsel, that she might receive her share of the proceeds of the sale of the farm, and there was informed that it could not be paid unless letters testamentary on Mrs. Miller's estate were taken out in Pennsylvania; the executor also learned, for the first time, that his sale being without authority from the Orphans' Court, was invalid. The executor, however, paid Mrs. Herriott $100, for which she gave him her individual receipt, as so much "on account of her share in the proceeds of the sale of land of the heirs of the late Samuel Galbreath, deceased."

Letters testamentary on the estate of Ann Miller were on the 22d of October 1867 granted in Pennsylvania to Mrs. Herriott.

Application was made by the executor to the Orphans' Court of Allegheny for authority to sell the farm.

After opposition by the children of Mrs. Miller, who desired

partition, the court authorized the sale of the farm. It was struck down to Abraham Bell and James K. Bell for $10,425. This sale was set aside and the farm was again exposed to sale and bought by the same persons for $18,350—one-third of the purchase-money to be paid in cash, one-third in one year and one-third in two years, both with interest; this sale was confirmed March 21st 1868. The fund to be distributed is the balance of the first instalment of the purchase-money.

The claimants on the fund were the children of Mrs. Miller and the Bells. As to the two-thirds which the Bells claimed under the conveyance to William Galbreath by Elizabeth Scroggs and Nancy Potter, their right was awarded.

Their ground of claim to the other third is thus stated by the auditor:

* * * "The Messrs. Bell claim that the urgency of the children and devisees, or legatees, of Ann Miller, in the winter of 1866 and 1867, and in the spring of 1867, to have the land sold, and what they said in their letters on the subject, amounted to an authority to William Galbreath to sell the land, as their agent, and without any authority from the Orphans' Court, for the purpose. They also claim that the acts of Nancy Herriott, the executrix of Ann Miller, after the sale to Andrews, and especially the acceptance of the $100 on the 3d of April 1867, and her receipt for it, declaring it to be on account of her share of proceeds of sale of land of the heirs of the late Samuel Galbreath, deceased, amounted to a ratification of the sale to Andrews; a ratification of it by her, as the executrix of her mother, and estopped the legatees or devisees of her mother from claiming anything, except what they are entitled to, out of the sale to Andrews. The Messrs. Bell claim that the Orphans' Court sale was not made for the benefit of the devisee of Samuel Galbreath, deceased, but was only to perfect the title of them (the Bells) in the property; that whether the property sold for much or little, at the Orphans' Court sale, was nothing to those devisees or legatees; that their rights were fixed by the sale to Andrews, and that they can only participate in the proceeds of the sale to him.

"It is claimed, on behalf of the Messrs. Bell, that the will of Samuel Galbreath had the effect to convert the land into personal property, and that, therefore, the Statute of Frauds did not stand in the way of the children of Ann Miller, or of her executrix, authorizing William Galbreath, by parol, to turn the property into money, or ratifying, by parol, the sale, for that purpose, to Matthew Andrews." * * *

"But it is claimed by the Bells that the children of Ann Miller are estopped from claiming any part of the proceeds of the last sale. It therefore becomes necessary to examine what the claim has to sustain it.

[Bell's Appeal.]

"Ann Miller's children expressed a desire to have the property divided, saying they believed it would sell better if it was divided. At least, this is the language of Mrs. Herriott. They urged the executor to sell it, even if it went for less than he had been holding it at. But they did not say one word as to the mode in which he should sell it. They recognised the fact that, being the surviving executor, he was the person to make the sale, and they urge him to make the sale. Is it not a fair, and even a violent presumption that they desired him to make it in the way in which the law required him to make it? Can it be supposed for a moment that they intended he should make it in a way that would pass no title to the purchaser; in a way in which no prudent man would buy, and, consequently, in a way in which it could not fail to be sacrificed?

"The auditor thinks there is nothing in the acts either of Nancy Herriott, or any other of Ann Miller's children, before the sale to Andrews, as far as he has evidence of such acts, that amounts to an authority from them to the executor, to make the sale to Matthew Andrews in the way he made it; and he so finds.

"It is alleged that Nancy Herriott ratified the sale to Andrews, by making no objection to it, and by receiving the $100 in the way before stated. Cyrus K. Potter says he told Mrs. Herriott all about the sale, and explained it all to her, and she made no objection to it.

"It must be remembered that Mrs. Herriott was a stranger here. So far as we are informed, she was entirely ignorant as to the value of land in the neighborhood, or as to the value of this land, except as she was informed of it by William Galbreath and Cyrus K. Potter. She was not told, so far as we know, that just two months after Andrews bought it, he sold it at an advance of $1250. There is no proof that she was told the property was sold in a way not authorized by law; in a way that would not pass a good title to the purchaser, and consequently in a way in which it was not to be expected that it would bring a fair price. The trustee was her uncle, and Cyrus K. Potter was her cousin—men in whom she would naturally have confidence—and it is not strange that she took their word, and made no objection to the sale until afterwards, when she found what the true state of the case was. Besides, she was here, far away from her home, without money to take her back to where she lived, and dependent on the friendship and hospitality of those very persons. Under these circumstances, it is not to be wondered at that she did not express any dissatisfaction with the sale, even if she felt it. If she had been told that the sale was made without authority of law, that at such a sale no prudent man would buy at all, and that at it probably no man at all would buy and pay a full price for the property, is it not likely that she would have ex-

pressed dissatisfaction with the transaction, and refused to have anything to do with it?

"Then as to the receipt of the $100 by Mrs. Herriott, there is no direct proof—no proof at all, apart from the transaction itself—that it was received, and the receipt given for it, with a view to ratifying the sale to Andrews. There was no proof that she was told that if she received the money, and signed the receipt for it, in the way it was written, it would amount to a ratification of the sale; no proof that the subject of ratification was mentioned to her at all, or that she had any knowledge that the sale needed ratification. She was a woman unaccustomed to do business, unacquainted with the legal effect of any act she did, or of any paper she signed, and, it seems to the auditor, ignorant of her rights in the premises. Under these circumstances, the auditor thinks that no ratification of the sale to Andrews can be implied from the acts of Mrs. Herriott."

The auditor, accordingly, after deducting some payments and the expenses of the audit, awarded to the Bells two-thirds of the balance, $2730.70, and to Nancy Herriott, executrix of Ann Miller, one-third, $1365.35.

The Bells excepted to the report, that the auditor did not award the whole sum to them.

The Orphans' Court confirmed the report, and decreed distribution accordingly.

The Bells appealed to the Supreme Court and assigned the decree for error.

*C. Hasbrouck* and *R. Woods*, for appellants.—The Act of March 12th 1800, § 3, Sm. Laws 434, Purd. 282, pl. 67, provides that when "testators have devised their real estate to their executors, to be sold, or have directed their executors to sell and convey such real estate, or have directed, or may hereafter direct such real estate to be sold, without naming or declaring who shall sell the same, if one or more of such executors is or are since dead or shall hereafter die, it shall and may be lawful for the surviving executor or executors, to sell and convey such real estate, or manage the same, for the benefit of the persons interested therein, as fully and completely as he, she, or they, together with his, her, or their co-executor, or co-executors, would be empowered to do, if he, she, or they, were still living." The Act of April 22d 1856, § 8, Pamph. L. 533, Purd. 277, pl. 25, provides that "Nothing in any Act of Assembly contained, shall be taken or construed to repeal or impair the Act of the 12th March 1800. * * * And it shall be the duty of the register of wills, in granting letters of administration, with the will annexed, to take adequate security for the faithful accounting for the proceeds of any sales of real estate, the administrator may make," &c. This act repeals the 12th

section of the Act of February 24th 1834, § 12, Pamph. L. 75;
Purd. 282, pl. 61, requiring the sales referred to in Act of 1800
to be made under the authority of the Orphans' Court.   By Act
of March 14th 1850, § 2, Pamph. L. 195, Purd. 976, pl. 64, the
powers of sale under a will may be executed by a private sale.
The will of Samuel Galbreath worked a conversion of his lands,
and his daughters took an interest in the proceeds only : Allison
*v.* Wilson, 13 S. & R. 332; Miller *v.* Meetch, 8 Barr 417; Mor-
ris *v.* Brenizer, 2 Rawle 185; Allison *v.* Kurtz, 2 Watts 185;
Silverthorn *v.* McKinster, 2 Jones 67; Horner's Appeal, 6 P. F.
Smith, 405.

*T. C. Lazear*, for appellee.

The opinion of the court was delivered, January 3d 1871, by
WILLIAMS, J.—The reasons given by the learned auditor for
the distribution made of the fund in this case are so satisfactory
that we need do nothing more than notice a point made on the
argument, which does not seem to have been made on the hearing
before the auditor.   The appellants' counsel contend that the 8th
section of the Act of 22d April 1856, Pamph. L. 533, repeals the
12th section of the Act of 24th February 1834, Pamph. L. 75, and
that now, under the Act of 12th March 1800, 4 Dallas 593, in
all cases where the testator has devised or directed his real estate
to be sold, without naming or declaring who shall sell the same,
the power may be exercised by the surviving executor, without
the control and direction of the Orphans' Court having jurisdic-
tion of his accounts, with the same effect as it might have been
exercised by such executor before the Act of 1834, and, there-
fore, that under the private sale made by the executor in this case
a good equitable title to the land, which the testator directed to
be sold, vested in the purchaser under whom the appellants claim.
But we are of the opinion that the 12th section of the Act of
1834 was not intended to repeal or impair the Act of 1800, giv-
ing power to the surviving executors to sell and convey real estate
when the direction and authority to sell are not given to any per-
son by name or description, but merely to regulate the mode or
form in which the power should be exercised.   There is no incon-
sistency between the two acts, and it would be a strained construc-
tion of the Act of 1856 to hold that it was intended to repeal by
implication the 12th section of the Act of 1834.   If the législature
had intended its repeal, it would have been easy for them to have
done it by apt words.   Whatever else may have been their purpose,
it is clear that they did not intend to repeal, by implication, so
wholesome a provision of the statute.

If the direction to sell the land and divide the proceeds worked
a conversion of the land into money, and vested the fee in the

[Bell's Appeal.]

executor, leaving to the legatees only an interest in the proceeds, the executor had no power to sell the land at private sale; nor had he any power to sell the appellee's interest. He was not her authorized agent to make the sale, and he did not profess to make it as her agent, or under any authority derived from her. He could only make a valid sale of the land by applying to the Orphans' Court and obtaining its order and direction. And as he failed to do this, the sale which he made vested in the purchaser no title to the share of the appellee's mother, either in the land or its proceeds. If he had reported the sale to the court, and obtained an order confirming it, on due notice to all parties in interest, that might have cured the want of a previous order and rendered the sale as valid and binding as if made under the order and direction of the court.

Decree confirmed, at the costs of the appellants.